IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, a New York corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>JACKSON COUNTY SCHOOL DISTRICT No. 9, EAGLE POINT, an Oregon municipal corporation,<br><br>    Defendant. | Civil No. 06-3035-PA<br>    (lead case)<br><br>**OPINION AND ORDER** |
| JACKSON COUNTY SCHOOL DISTRICT No. 9, EAGLE POINT,<br><br>    Plaintiff,<br><br>    v.<br><br>GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, a New York corporation,<br><br>    Defendant. | Civil No. 06-3042-PA<br><br>(consolidated cases) |

**Panner, J.**

    Great American Insurance Co. ("Great American") brought an action in federal court seeking declaratory relief from Jackson County School District #9, aka Eagle Point School District #9, an Oregon municipal corporation ("Eagle Point"), CV 06-3035-PA.

1 - OPINION AND ORDER

The same day, Eagle Point filed an action against Great American in state court, for breach of contact and declaratory relief. Great American removed Eagle Point's action to federal court, CV 06-3042-PA, where the cases were then consolidated. Pending before the court are the parties' cross-motions for partial summary judgment.

## Background

The basic facts are not in dispute. Great American sold Eagle Point an insurance contract, policy number PAC 7-29-19-02-10, providing property insurance for the Eagle Point Junior High School for the period July 1, 2002 through July 1, 2003. The policy's pre-loss Statement of Value listed the value of the Eagle Point Junior High as $5,092,265.00 and its attached gym as $1,175,722.00.

On August 29, 2002, a fire damaged beyond repair 58,000 square feet of the junior high school, consisting of a gymnasium building and two wings containing library, offices, classrooms and other rooms. The cafeteria adjacent to the gymnasium also sustained damage.

Eagle Point decided to replace the damaged school with a new building to be constructed across the street. The policy permits Eagle Point to do this. Great American's liability is limited to the amount it would have cost Eagle Point to rebuild at the original site, or the amount actually spent that is necessary to repair or replace the damaged property, whichever is less.

Eagle Point also decided it will construct a new grade school instead of a replacement junior high school, with a design

2 - OPINION AND ORDER

different from the building being replaced. Again, the parties agree Eagle Point may do this, but the maximum sum Great American is obligated to pay towards the new building is unchanged. The parties will simply estimate what it would have cost to rebuild the damaged property at the original location.

To their credit, the parties have worked together amicably to resolve most issues. A few disputes have arisen, though, that require judicial resolution.

The issues addressed in this opinion mostly concern the proper method of computing replacement cost under the insurance policy.

## Discussion

### I. *Like Kind and Quality*

_____The Replacement Cost provisions in the policy state, in relevant part:

> **e.**   We will not pay more for loss or damage on a replacement cost basis than the least of **(1)**, **(2)**, or **(3)**, subject to **f.** below:
>
> > **(1)**   the Limit of Insurance applicable to the lost or damaged property;
> >
> > **(2)**   the cost to replace the lost or damaged property with other property:
> >
> > > **(a)**   of comparable material and quality; and
> > >
> > > **(b)**   used for the same purpose; or
> >
> > **(3)**   the amount actually spent that is necessary to repair or replace the lost or damaged property.
> >
> > If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the

3 - OPINION AND ORDER

> cost which would have been incurred if the building had been rebuilt at the original premises.

The Policy also includes a Replacement Cost endorsement:

A.   REPLACEMENT COST COVERAGE

The term "Replacement Cost" is substituted for the term "Actual Cash Value" whenever used in this policy thereby providing a loss adjustment based on the cost of repairing, replacing or reinstating (whichever is the least) with material of like kind and quality without deduction for depreciation, subject to the following provisions:

\* \* \* \*

3.  The Company's liability for loss hereunder shall not exceed the smallest of the following amounts:

    a.  The replacement cost of the property or any part thereof identical with such property and intended for the same occupancy and use.

    b.  The amount actually and necessarily expended in replacing said property or any part thereof.

4.  In no event will the amount paid under this coverage exceed or act to increase the Loss Limit shown in the Declarations section.

_____

_____The parties dispute the maximum amount Great American must pay under the policy. Eagle Point contends that maximum amount is the cost to construct, at the original site, a replacement building essentially identical to the previous school, using the kinds of materials and construction techniques employed when the original building was built many years ago. Great American contends the cost estimate should assume that the replacement

4 - OPINION AND ORDER

school will be built using cheaper (yet "comparable") modern construction materials and techniques.

For instance, the old school contained a "barrel-dome roof gymnasium of a very ornate and elaborate design." Eagle Point estimates it would cost $719,280 to recreate that roof. Great American contends the roof could be replaced, using a simple truss design and cheaper materials, for just $193,000. The new roof would not be as ornate, but would accomplish the same task (keeping the water out) and, in Great American's view, it would be functionally equivalent to the old roof. Eagle Point counters that "functionally equivalent" isn't the same as "like kind and quality." Eagle Point also points to the word "identical" in paragraph A(3)(a) of the Replacement Cost endorsement.

The contentions of the parties are further illuminated by a dispute regarding lumber. The damaged school was constructed using full dimensional clear grain studs. Eagle Point contends Great American is liable for the cost of replacing the school with full dimensional clear grain studs rather than with the less expensive pine wood studs often used nowadays. Great American responds that:

> Dimensional lumber and clear grain old growth fir and cedar, while readily and cheaply available in Oregon in the 1940s, is practically unavailable in today's market and, where available, is prohibitively expensive. Defendant's use of these historical materials in its insurance claim has almost tripled the reasonable cost of replacing the old school. The functional equivalent construction materials in today's market are pine studs, plywood laminates, and glue-lam beams.

5 - OPINION AND ORDER

Eagle Point does not actually intend to build a school with old growth lumber studs and an ornate barrel-dome roof. Rather, this is an exercise in the hypothetical. The estimated cost to construct the hypothetical replacement junior high school will establish the maximum amount Great American must contribute towards the cost of constructing the new grade school that Eagle Point actually plans to build.

For purposes of this summary judgment motion, I do not decide whether the particular design and materials proposed by Great American are the most appropriate, or if the design and materials urged by Eagle Point are closest to the mark, or whether the answer lies in between. Rather, the issue before the court today is what standard to apply.

Nothing in the insurance contract, or in the circumstances attending the execution of that contract, suggests the parties were concerned with maintaining the historical integrity or ambience of the structure, or that the insurance premium was computed with those considerations in mind. The policy did not insure, for example, a museum or historic site, or a custom-designed home or business.[1] Rather, the school was a functional structure, and the purpose of the insurance policy was to ensure Eagle Point could construct a replacement school if necessary.

/ / / /

---

[1] For instance, the ambience of a restaurant could be an integral ingredient in some circumstances. Not only isn't that the situation here, but many disputed items--such as the studs--will be inside walls and not visible. With regard to the "ornate" ceilings, and other damaged or destroyed features of the old school, Eagle Point may be entitled to a <u>reasonable</u> allowance for artistic features in designing the new project.

6 - OPINION AND ORDER

The insurance contract contemplates replacement with a structure "(a) of comparable material and quality; and (b) used for the same purpose." Comparable --or "like kind and quality"-- does not necessarily mean using the identical materials and construction techniques, particularly when the original construction occurred decades earlier. Neither, however, does it entitle Great American to use only the cheapest materials and construction techniques available. Eagle Point is entitled to a quality structure, one comparable to the quality and durability of the school that was damaged.

A good starting point will be to consider the materials and construction techniques a builder might use today if he actually intended to construct a school (as opposed to this exercise in the hypothetical).

I have considered Eagle Point's arguments regarding this issue, but am not persuaded by them. The word "identical," in the context it appears, is insufficient to overcome other language in the policy pointing toward a more flexible standard. Common sense also counsels against adopting Eagle Point's position on this issue.

## II. *Streets, Sidewalks, and Other Improvements Outside the School Buildings*

_____Great American concedes it must pay for upgrades to the school buildings required by building codes that were in effect at the time of the loss on August 29, 2002, if such upgrades are required in order to rebuild. This assumes, once again, reconstruction of a hypothetical junior high school at the

7 - OPINION AND ORDER

original location. However, Great American argues, it is not obliged to pay for any improvements occurring outside the school buildings, such as roadways or sidewalks, even if these improvements are mandated by current zoning and building codes.

I disagree. The policy provides, in relevant part:

> (2) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property * * * *
>
> (3) The ordinance or law referred to in e(2) of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

* * * *

The policy also contains an Increased Cost of Construction Coverage (Excess of Replacement Cost) endorsement, which states in relevant part:

> The Loss Limit is extended to include an amount equal to the increased cost of repair, rebuilding or construction of the building(s), on the same premises, of like height, floor area, and style and for like occupancy, caused by loss from any peril insured against under this policy and resulting from the enforcement of and limited to the minimum requirements of any state or municipal law or ordinance regulating the construction or repair of damaged building(s).

The language of the policy is clear. If, as Eagle Point contends, a legally-required condition of rebuilding is that Eagle Point must improve streets adjacent to the school, including installing sidewalks and making other upgrades to the

8 - OPINION AND ORDER

sites, then such costs are properly characterized as costs incurred by Eagle Point as a consequence of the damage to the insured property and a prerequisite to rebuilding the school. But for the fire, and the decision to rebuild, those costs would not have been incurred. This is an "increased cost incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property." The policy makes Great American responsible for those costs.

I am not persuaded by Great American's assertion that reconstruction costs are confined to the building, and exclude facilities such as streets, sidewalks, or other improvements not <u>physically</u> necessary to rebuild the structure. Even if such exterior improvements are not covered independently under the policy, *e.g.*, if a sidewalk or roadway were accidentally damaged, Great American nevertheless is responsible to the extent such improvements are <u>legally</u> required as a condition of rebuilding the school. The insurance contract contemplates this circumstance, and allocates that risk to Great American.

I also note that the additional coverage purchased by Eagle Point, in the form of the Increased Cost of Construction Coverage endorsement, is not restricted to requirements that were in effect at the time of the loss. By inference, it also extends to restrictions that are in effect at the time of rebuilding, but were enacted after the date of the loss.

The cases Great American relies upon are not on point.
/ / / /

9 - OPINION AND ORDER

Great American's alternative argument is that Eagle Point was not legally obligated to construct the Lava Lane extension, but voluntarily incurred that obligation by selling an easement to the City two years after the fire. The briefing was not sufficient for the court to rule on this question today.

### III. Whether Eagle Point's Claims are Time-Barred

The parties dispute vigorously the interpretation of the negotiations between them following the fire. It is clear, however, that there were extensive negotiations, and a process that stretched over several years. Considerable delay also resulted because Eagle Point is a school district and could not practically proceed with construction until the matter of compensation was resolved.[2] There also were public hearings and other procedures. Architects prepared various plans and cost estimates. The parties worked cooperatively, in good faith, during the years following the fire.

Though the policy contains a two-year period of limitation, the undisputed evidence demonstrates that Great American waived this provision and continued to negotiate well beyond that two-year period. Until negotiations between the parties reached an impasse recently, there was no reason for Eagle Point to file an action against Great American. The parties appeared to be resolving the matter on their own. Eagle Point reasonably and justifiably relied upon Great American's conduct and statements and refrained from commencing an action sooner.

---

[2] I am aware of Great American's contentions regarding the earlier bond measure, but that does not alter my conclusion.

Eagle Point's claims are not time-barred. Summary Judgment is granted for Eagle Point against Great American's First Affirmative Defense, and paragraph 30 of Great American's Third Affirmative Defense, in CV 06-3042-PA.

### IV. Failure to Complete Construction

Great American contends the court should dismiss Eagle Point's claims, and declare that Eagle Point is entitled to recover nothing under the Replacement Cost provisions of the policy, because replacement has not occurred. It was impractical for Eagle Point to proceed with replacement until the parties (or the court) determines the extent of Great American's obligation to finance the replacement school. Great American also has been involved in approving various aspects of the reconstruction plan.

Equally unpersuasive is Great American's contention that it should be relieved from its obligations under the insurance policy because repair or replacement was not executed with due diligence or dispatch.

Summary judgment is granted for Eagle Point against paragraphs 24 and 25 of Great American's Second Affirmative Defense, and paragraph 28 of Great American's Third Affirmative Defense, in CV 06-3042-PA.

### V. Increases in Construction Costs Since August 2002

Great American contends it is not liable for any increases, attributable to inflation, in construction costs since the fire in August 2002. Great American acknowledges the "policy does not specifically address the increased cost of construction over time." Great American argues that some limit necessarily is

11 - OPINION AND ORDER

implied by language requiring replacement to be undertaken "with due diligence and dispatch and, in [any] event . . . within two (2) years after the destruction or damage . . . ."

I agree. Although Great American waived the provision requiring litigation to be commenced, if at all, within two years from the date of the loss, that does not mean Eagle Point is entitled to continuing inflationary costs without limitation. Eagle Point's status as a school district, and insistence that replacement cost be computed using the same materials and construction techniques that were used at the time of original construction, has extended the negotiations.

Under these circumstances, while the two-year limitation does not preclude the filing of litigation by Eagle Point, under the circumstances of this case that limitation does establish a reasonable ceiling for inflation when computing the cost of replacement. Eagle Point is not entitled to recover for added costs attributable to inflation beyond that two year window. Eagle Point's motion for summary judgment, against Great American's Third Affirmative defense in CV 06-3042-PA, is thus granted in part and denied in part.

## Conclusion

The motions for partial summary judgment by Great American (# 45 in CV 06-3035-PA and # 47 in CV 06-3042-PA) and by Eagle Point (# 53 in CV 06-3035 and # 55 in CV 06-3042-PA) are granted in part, and denied in part, as stated above.

With the benefit of this guidance, the parties should now be able to resolve the remaining issues without further judicial

12 - OPINION AND ORDER

involvement. If not, the court will schedule a hearing on whether to appoint a special master at the parties' expense.

IT IS SO ORDERED.

DATED this 17th day of September, 2007.

/s/ Owen M. Panner
_____
OWEN M. PANNER
UNITED STATES DISTRICT JUDGE

13 - OPINION AND ORDER